913 F.2d 576
 20 Envtl. L. Rep. 21,232
 UNITED STATES of America, Plaintiff-Appellee,
Confederated Tribes of the Warm Springs Reservation, et al.;
Confederated Tribes & Bands of the Yakima Indian Nation;
Confederated Tribes of the Umatilla Indian Reservation; Nez
Perce Indians, Intervenors-Appellees,
State of Idaho, Shoshone-Bannock Tribe, Intervenors-Appellants,
Makah Indian Tribe, Applicant in Intervention Appellant,
v.
STATE OF OREGON; State of Washington, Defendants-Appellees.
 Nos. 88-4311, 88-4316 and 88-4347.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 10, 1990.
Decided Aug. 27, 1990.
 
 Marc D. Slonim and Alvin J. Ziontz, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, Wash., Clive J. Strong and Charles F. Adams, Deputy Atty. Gen., Boise, Idaho, and Howard A. Funke, Fort Hall, Idaho, for defendants-intervenors-appellants.
 Dirk D. Snel, Land & Natural Resources Div., and M. Alice Thurston, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.
 Howard G. Arnett, Marceau, Karnopp, Petersen, Noteboom & Hubel, Bend, Oregon, Timothy Weaver, Cockrill, Weaver & Bjur, Yakima, Wash., Craig Dorsay, Oregon Legal Services and Lindsey, Hart, Neil & Weigler, Portland, Or., for intervenors-appellees.
 Robert K. Costello, Asst. Atty. Gen., Olympia, Wash., and Cheryl F. Coodley, Asst. Atty. Gen., Portland, Or., for defendants-appellees.
 Thane W. Tienson and Mary Kyle McCurdy, Mitchell, Lang & Smith, Portland, Or., for amici curiae.
 Appeal from the United States District Court for the District of Oregon.
 Before BROWNING, BEEZER and RYMER, Circuit Judges.
 BEEZER, Circuit Judge:
 
 
 1
 These appeals concern the Oregon district court's approval of a plan allocating the harvest of Columbia River salmon and steelhead. The State of Idaho and the Shoshone-Bannock tribes challenge the allocation of fish that reach Idaho. They opposed the plan at the time of the district court's approval hearings, but the court approved the plan over their objections. The Makah, an ocean fishing tribe, challenge the quota allocated to the ocean fishery. They sought to intervene in the suit, but their motion was denied. Each party appeals the adverse rulings affecting it. We affirm.
 
 
 2
 * A complex judicial and administrative scheme has evolved to regulate the harvest of Columbia River salmon and steelhead. These fish travel hundreds of miles along an arduous migratory route and are very valuable. See Idaho ex rel. Evans v. Oregon, 444 U.S. 380, 382, 100 S.Ct. 616, 618, 62 L.Ed.2d 564 (1980) (Idaho I ). Ordinarily, regulation of these fisheries would be a local matter, determined by state law. However, in 1968, the Supreme Court held that Indian tribes with treaty rights to fish may not be limited by state regulations that infringe on those rights. Puyallup Tribe v. Department of Game, 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968). Shortly thereafter, suits were filed in the federal district courts of Oregon and Washington to enforce this standard against the states. See Sohappy v. Smith/United States v. Oregon, 302 F.Supp. 899 (D.Or.1969); United States v. Washington, 384 F.Supp. 312 (W.D.Wash.1974), aff'd, 520 F.2d 676 (9th Cir.1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976). Both courts retain continuing jurisdiction. In addition, Congress enacted the Fishery Conservation and Management Act of 1976 (FCMA),[1] which regionalizes fishery management and can preempt state regulation.
 
 
 3
 United States v. Oregon became the forum for allocating the harvest of fish that enter the Columbia River system. See United States v. Oregon, 699 F.Supp. 1456, 1458-60 (D.Or.1988); Comment, Sohappy v. Smith: Eight Years of Litigation Over Indian Fishing Rights, 56 Or.L.Rev. 680 (1977). The parties to the suit are the states of Washington, Oregon, and Idaho, four Columbia River treaty tribes (Yakima, Nez Perce, Umatilla and Warm Springs), the Shoshone-Bannock tribes and the Colville tribe. The fishery is directly regulated by the states of Washington and Oregon under the 1918 Columbia River Compact.[2] Harvest quotas are set by the compact states after negotiations with the other parties and adopted with court approval. A Technical Advisory Committee advises the Oregon court.
 
 
 4
 United States v. Washington became the forum for allocating fishing rights within the jurisdiction of the state of Washington, extending three miles out to sea. See United States v. Washington, 384 F.Supp. at 312. The parties to the action include the Puget Sound treaty tribes, ocean treaty tribes (including the Makah[3]), certain Columbia River tribes for limited purposes, and the state of Washington. A Fisheries Advisory Board advises the Washington court.
 
 
 5
 Outside the three-mile limit, ocean fishing is regulated by the federal government under the FCMA. The FCMA establishes the Pacific Fishery Management Council (PFMC), which is composed of representatives of Washington, Oregon, California and Idaho, one representative of the Indian tribes, and the federal government. 16 U.S.C. Sec. 1852(a)(6). The PFMC develops a regional fishery management plan which must be consistent with applicable law, including Indian treaty rights, and must consider the regulations of coastal states. 16 U.S.C. Secs. 1853(a)(1)(C); 1853(b)(5).
 
 
 6
 These appeals concern the most recent Columbia River Fish Management Plan, approved by the Oregon court in 1988. It was negotiated by the parties to the suit from 1983 to 1987 and is intended to be effective for 10 years. In its final form, the plan sets minimum "escapement" levels for all Columbia River runs with quotas low enough to protect the weakest runs.
 
 
 7
 Idaho and the Shoshone-Bannock tribes fear the plan gives inadequate protection to Idaho wild steelhead. They also allege defects in the court's approval process. The Makah, not a party to the suit, contend that the plan assigns most of the allowable catch of the weakest run to river fishermen, requiring low ocean quotas. They seek to intervene to oppose the ocean quotas and to participate in future negotiations.
 
 
 8
 We have jurisdiction over these timely appeals under 28 U.S.C. Sec. 1291. The court's order approving the 1988 plan is an appealable post-judgment final order under the district court's continuing jurisdiction. United States v. Washington, 761 F.2d 1404, 1406-07 (9th Cir.1985). Denial of a motion to intervene is a final order and immediately appealable. Diaz v. Trust Territory of the Pacific Islands, 876 F.2d 1401, 1404 (9th Cir.1989).
 
 II
 Idaho's Opposition to the Plan
 
 9
 Idaho opposed the 1988 plan chiefly because it provides insufficient protection for Idaho wild steelhead, which Idaho believes could face extinction. Accordingly, although Idaho participated in the negotiations, it did not sign the final plan. Idaho now challenges the court's approval of the plan on procedural and substantive grounds.
 
 A. Procedural Claims
 
 10
 Idaho first argues that the district court erred because it considered Idaho's opposition to the plan to be a request for an injunction, placing the burden on Idaho to show the balance of hardships weighed in its favor. Idaho argues that the plan is more like a consent decree, requiring the court to review the substance of the plan for legality and fairness, with the burden on the proponents.
 
 
 11
 A consent decree is "essentially a settlement agreement subject to continued judicial policing." Williams v. Vukovich, 720 F.2d 909, 920 (6th Cir.1983). It is not a decision on the merits or the achievement of the optimal outcome for all parties, but is the product of negotiation and compromise. See United States v. Armour & Co., 402 U.S. 673, 681-82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). Consent decrees are often designed to be carried out over a number of years. Local 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 523 n. 13, 106 S.Ct. 3063 n. 13, 3076 n. 13, 92 L.Ed.2d 405 (1986). We have implied in earlier decisions that agreements reached in this matter may be consent decrees. See, e.g., United States v. Oregon, 769 F.2d 1410, 1416 (9th Cir.1985).
 
 
 12
 On appeal, all parties state that the plan is most like a consent decree. We agree that this characterization fits here. We review acceptance of a consent decree for abuse of discretion. Davis v. City & County of San Francisco, 890 F.2d 1438, 1445 (9th Cir.1989); Officers for Justice v. Civil Service Comm'n of the City and County of San Francisco, 688 F.2d 615, 625-26 (9th Cir.1982), cert. denied, 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983). Under this standard, we will reverse the district court only if its decision was based on an error of law or clearly erroneous findings of fact. United States v. Oregon, 769 F.2d at 1416. We may not substitute our notion of fairness for that of the district court. Davis, 890 F.2d at 1445.
 
 
 13
 Idaho identifies several aspects of the district court's ruling that it contends are errors of law. We discuss each in turn.
 
 1. Standard of review by district court
 
 14
 Idaho first argues that the district court applied the wrong legal standard to evaluate the plan. It argues that the court applied a balance of hardships test, when a more rigorous investigation into the legality of the plan was required.
 
 
 15
 Before approving a consent decree, a district court must be satisfied that it is at least fundamentally fair, adequate and reasonable. Id. In addition, because it is a form of judgment, a consent decree must conform to applicable laws. See United States v. City of Miami, 664 F.2d 435, 439, 441 (5th Cir.1981)(en banc)(per curiam)(Rubin, J., concurring); see also SEC v. Randolph, 736 F.2d 525, 528 (9th Cir.1984)(citing Miami with approval).
 
 
 16
 However, a consent decree need not impose all the obligations authorized by law. See Local 93, 478 U.S. at 522-23, 106 S.Ct. at 3075; EEOC v. Safeway Stores, Inc., 611 F.2d 795, 800 (10th Cir.1979)(consent decree will not be vacated "merely because it is legally erroneous"), cert. denied, 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 809 (1980). Rather, the court's approval "is nothing more than 'an amalgam of delicate balancing, gross approximations and rough justice.' " Officers for Justice, 688 F.2d at 625 (citation omitted). The court need only be satisfied that the decree represents a "reasonable factual and legal determination." Miami, 664 F.2d at 441.
 
 
 17
 Idaho argues that a consent decree that affects the public interest or third parties imposes a heightened responsibility on the court to protect those interests. Although we have recognized that the court has such a duty, see Davis, 890 F.2d at 1444 n. 5; Randolph, 736 F.2d at 529; we have also held that this requirement is intended to protect those who did not participate in negotiating the compromise, not those who negotiated it. Collins v. Thompson, 679 F.2d 168, 172 (9th Cir.1982). Furthermore, the court need not require that the decree be "in the public's best interest" if it is otherwise reasonable. Randolph, 736 F.2d at 529 (emphasis in original).
 
 
 18
 Applying these principles to the court's approval of the 1988 plan, we find no error here. The district court stated it would employ a balancing test to evaluate Idaho's objections, but in evaluating the relative hardships it examined not only the plan's fairness and reasonableness, but also its legality and impact on the public interest. The district court concluded that this plan was reasonable and legal. This standard was not erroneous.
 
 2. Burden of Proof
 
 19
 Idaho next argues that by characterizing its objections as a motion for an injunction, the court erred in placing the burden of proof on Idaho instead of the parties seeking acceptance of the plan.
 
 
 20
 In this circuit, we have usually imposed the burden on the party objecting to a class action settlement. See Moore v. City of San Jose, 615 F.2d 1265, 1272 (9th Cir.1980). Likewise, other circuits have held that once the court is satisfied that the decree was the product of good faith, arms-length negotiations, a negotiated decree is presumptively valid and the objecting party "has a heavy burden of demonstrating that the decree is unreasonable." Vukovich, 720 F.2d at 921; accord, Stotts v. Memphis Fire Dept., 679 F.2d 541, 554 (6th Cir.1982), rev'd on other grounds, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984); cf. Bass v. FSLIC, 698 F.2d 328, 330 (7th Cir.1983)(collusive settlement with third party voids usual deference to settlement agreement). Idaho does not contend that the negotiations were collusive.
 
 
 21
 Idaho cites several cases regarding class action settlements where other circuits have placed the burden on the party moving for approval. However, these cases generally involve agreements distributing a large share of class funds to certain named plaintiffs. See, e.g., Plummer v. Chemical Bank, 668 F.2d 654, 656 (2d Cir.1982); Holmes v. Continental Can Co., 706 F.2d 1144, 1147 (11th Cir.1983). We conclude that the district court did not impose an improper burden here.
 
 3. Evidentiary hearing
 
 22
 Idaho next argues that the court erred because it did not conduct a full evidentiary hearing. At the hearing on the motion for approval of the plan, Idaho presented detailed affidavits from two experts showing the threat to the wild steelhead. The parties seeking approval of the plan presented an affidavit that contradicted some of Idaho's conclusions. Idaho argues that it should have had a chance to cross-examine witnesses and conduct further discovery.
 
 
 23
 We disagree. First, although some circuits have allowed cross-examination of witnesses at hearings on class action settlements, see, e.g., Greenfield v. Villager Industries, Inc., 483 F.2d 824, 833 (3d Cir.1973)(shareholder suit); Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir.1975)(citing Greenfield ); other courts have rejected this requirement. "The growing rule is that the trial court may limit its proceeding to whatever is necessary to aid it in reaching an informed, just and reasoned decision." Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir.1977). See also Plummer, 668 F.2d at 659 (court not expected to "convert settlement agreement hearings into trials on the merits"); City of Detroit v. Grinnell Corp., 495 F.2d 448, 462 (2d Cir.1974)(court "must stop short of the detailed and thorough investigation" of a trial).
 
 
 24
 We think the latter is the better rule. A disputed decree that lacks the consent of those who negotiated it may be approved, so long as each party is given the opportunity to "air its objections" at a reasonableness or fairness hearing.[4] Local 93, 478 U.S. at 529, 106 S.Ct. at 3079; see e.g., Davis, 890 F.2d at 1444; Vukovich, 720 F.2d at 921. The reviewing court should not determine contested issues of fact that underlie the dispute. Officers for Justice, 688 F.2d at 625.
 
 
 25
 Idaho nevertheless argues that the district court made no effort to find out the true facts regarding the steelhead runs, when the evidence presented was contradictory. We have remanded class action settlements if the record reveals no inquiry into the facts in dispute. See Ficalora v. Lockheed Calif. Co., 751 F.2d 995, 996 (9th Cir.1985). We have also required evidentiary hearings when there was some dispute about the existence or terms of the agreement itself. See Callie v. Near, 829 F.2d 888, 890-91 (9th Cir.1987). However, if the district court had sufficient facts to approve the plan intelligently, then "there is no reason to hold an additional hearing on the settlement or to give appellants authority to renew discovery." Grinnell Corp., 495 F.2d at 463. Familiarity of the court with the lawsuit can be an important factor. Miami, 664 F.2d at 441 nn. 13, 14. Here the record, files and transcripts had been building for years, providing a solid base for intelligent approval of the plan.
 
 
 26
 Idaho further argues that even if a consent decree does not require an evidentiary hearing, ruling on an injunction coupled with a decision on the merits does. We have recognized that if the facts are simple and little time would be taken, a court may be required to hold an evidentiary hearing on a motion for an injunction. Aguirre v. Chula Vista Sanitary Serv. and Santi-Tainer, Inc., 542 F.2d 779, 781 (9th Cir.1976). However, we have rejected any presumption in favor of evidentiary hearings, especially if the facts are complicated, as they are here. See International Molders' Local Union No. 164 v. Nelson, 799 F.2d 547, 554-55 (9th Cir.1986). Furthermore, approval of a negotiated agreement is not a decision on the merits and the court should not resolve underlying factual disputes at this stage. Officers for Justice, 688 F.2d at 625.
 
 
 27
 Viewing the court's approval of the plan as a ruling on either a consent decree or an injunction, we find no error in the court's denial of further evidentiary hearings or discovery. Idaho was permitted to "air its objections" and present its extensive factual analysis. This meets the standard required of the district court. See Local 93, 478 U.S. at 529, 106 S.Ct. at 3079.
 
 B. Legality of the Plan
 
 28
 Idaho next argues that the district court erred in approving the plan because it violates legal standards in two important respects. Idaho's chief objection is that it violates applicable conservation standards because the plan threatens its wild steelhead with extinction. It also argues that the plan violates treaty/nontreaty sharing formulas set by the court in this case. Idaho argues that these requirements are absolute and cannot be traded away in negotiations.
 
 1. Steelhead
 
 29
 Idaho argues that the plan violates conservation standards established in this case because it threatens the wild steelhead with extinction.[5] Idaho proposed ways to alleviate this problem but they were rejected during negotiations. The other parties respond that they have no duty to conserve the species, that the conservation standards Idaho cites are not legally enforceable, that Idaho's proposed alternatives are unworkable and that, in any event, the plan does not threaten the steelhead.
 
 
 30
 We reject any suggestion that the states of Washington and Oregon have no duty to conserve the species. In Idaho ex rel. Evans v. Oregon, 462 U.S. 1017, 1025, 103 S.Ct. 2817, 2823, 77 L.Ed.2d 387 (1983)(Idaho II ), an action brought by Idaho against Oregon and Washington under the Supreme Court's original jurisdiction, the Court established Idaho's equitable entitlement to some share of Columbia River fish. The Court held that the fish are a natural resource like water, and they may not be "owned" or depleted by any state along their path. See id. at 1024, 103 S.Ct. at 2822. Thus Idaho "has no legal right to the anadromus fish hatched in its waters" but it does have "an equitable right to a fair distribution of this important resource." Id. at 1025, 103 S.Ct. at 2823. Accordingly, Oregon and Washington "have an affirmative duty under the doctrine of equitable apportionment to take reasonable steps to conserve and even augment the natural resources within their borders for the benefit of other states." Id. Any plan that harms the runs "could not or should not survive a finding by this Court that Idaho is entitled to some of those fish." Idaho I, 444 U.S. at 392, 100 S.Ct. at 623.
 
 
 31
 Idaho does not base its argument here on its entitlement to an equitable apportionment.[6] Nevertheless, we may reject the argument of the compact states that they have no duty to conserve a species that passes through their waters. When we allowed Idaho to intervene in this suit we acknowledged that it has a protectable interest in the fish. See United States v. Oregon, 745 F.2d 550, 553 (9th Cir.1984). Idaho points to other instances in the law of this case imposing an enforceable duty on states and tribes. For example, at the beginning of this action, the district court held that a state may be prohibited from managing a fishery so that "little or no harvestable portion" reaches historic tribal fishing places. Sohappy, 302 F.Supp. at 911. We recognized a moral and equitable responsibility on the part of tribes "to allow sufficient escapement" by observing conservation levels set by the state. United States v. Washington, 520 F.2d 676, 686 n. 3 (9th Cir.1975). We held that treaty rights presume there are fish to allocate and we "may enjoin those who would interfere with that custody." United States v. Oregon, 657 F.2d 1009, 1015 (9th Cir.1982)(citing Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 692 n. 32, 99 S.Ct. 3055, 3078 n. 32, 61 L.Ed.2d 823 (1979)). We have held that "neither the treaty Indians nor the state ... may permit the subject matter of these treaties to be destroyed." United States v. Washington, 520 F.2d at 685.
 
 
 32
 Whether the plan violates this duty not to destroy the runs is less clear. The Idaho II Court held that to show injury, Idaho "must prove by clear and convincing evidence some real and substantial injury or damage ... based on present conditions." Idaho II, 462 U.S. at 1027, 103 S.Ct. at 2824 (internal citations omitted). By this logic, to show the 1988 plan is "illegal," Idaho would have to show by clear and convincing evidence that the runs have already suffered substantial injury under the plan. Idaho concedes that it cannot show present injury because no steelhead runs harvested at the high rate called for in the plan have yet returned to be measured.
 
 
 33
 Idaho argues instead that we should adopt the standards of conservation we have allowed in our earlier decisions in this matter and apply them to the duty we recognize here. In those decisions we have held that states may limit allocations to treaty fishermen for conservation purposes by a "comfortable margin." United States v. Oregon, 718 F.2d 299, 305 (9th Cir.1983). We have recognized that "some limitations are needed to preserve the population" of wild fish and emphatically rejected the argument of treaty fishermen that states may limit their harvests only when a run becomes endangered. Id. at 304-05. Rather, "a 'reasonable margin of safety' between an existing level of stocks and the imminence of extinction is the heart and soul of conservation." Id. at 305; see also United States v. Oregon, 769 F.2d at 1416 (states may limit treaty harvests in manner that is the " 'least restrictive which can be imposed consistent with assuring the necessary escapement of fish for conservation purposes.' ") (citation omitted).
 
 
 34
 These decisions have not, however, established a duty to limit treaty harvests for conservation purposes by a "comfortable margin." In fact, we have noted that the compact states have entered into agreements that did not consider conservation at all. See United States v. Oregon, 769 F.2d at 1417 n. 6. We are reluctant to hold as a matter of law that limits on treaty harvests voluntarily adopted by the states must be grafted onto the duty to see that the runs are not destroyed.
 
 
 35
 It is not necessary that we do so on this record in this case, because in any event the district court did not err in approving the plan. Idaho's methods of calculating escapement goals and estimating spawning escapement are based on different scientific estimates from those underlying the plan and those used in prior management plans. However, its proposals were not submitted to the other parties for evaluation and negotiation within the framework of the plan. Thus, the other parties' technical representatives never had the opportunity to analyze the conclusions that Idaho reaches. The appellee States and tribes presented evidence that wild steelhead had been managed under guidelines identical to those in the plan during the years 1984-1987, and the runs were above or near escapement goals for those years.
 
 
 36
 The district court was therefore presented with two management proposals, one based on methods never presented to TAC for peer review evaluation, the other containing guidelines identical to those adopted in previous years. The court held that Idaho "should first bring its concerns to TAC within the existing structure and not as an objection to adoption of the 1988 plan itself." It also noted that the plan had built-in flexibility to accommodate Idaho's concerns. First, the plan's steelhead management scheme is only in effect for three years and all of the provisions affecting steelhead management are subject to review after the 1988 season. For this reason, as the district court stated, "the Plan itself allows Idaho the opportunity to continue its negotiations and assert its recommendations with the moving parties for further consideration of steelhead conservation." Further, the plan allows for modifications in the event that Idaho's methods of calculating spawning escapement prove correct. Second, the plan contains emergency modification procedures that could be implemented if the wild steelhead returns show a significant decline. Finally, the district court retains continuing jurisdiction to grant further or amended relief. In light of these considerations, we are not left "with the definite and firm conviction that a mistake has been committed." United States v. Oregon, 718 F.2d at 305 (internal quotation and citations omitted).
 
 
 37
 We are sympathetic to Idaho's position. We have consistently recognized that conservation is an important goal of resource management. See United States v. Williams, 898 F.2d 727, 729 (9th Cir.1990). There is no doubt that the health of the wild steelhead run and each of the other stocks is of vital importance to Idaho and the entire region. These fish have evolved into a marvelously interdependent ecosystem that cannot be compartmentalized. The vitality of wild stocks is important to the health of hatchery fish, which are vulnerable to accident and disease.[7] Our concern is heightened by the fact that the current, imperfect regional scheme provides only fractured management of this unitary resource.
 
 
 38
 We therefore encourage the district court to monitor this situation closely. The district court supported its decision in part by noting that the steelhead runs are specially designated for review to take place after the 1988 season. If the situation proves to deteriorate, the district court can and should modify its order immediately. See United States v. Oregon, 769 F.2d at 1415.
 
 2. Treaty/Nontreaty Share
 
 39
 Idaho objects that the spring chinook harvest schedule violates the treaty/nontreaty sharing formulas required by the law of this case. That allocation is generally agreed to be 50% to each and "all fish count." Idaho argues that under the plan, spring chinook are harvested in the Columbia River as well as its tributaries, but these catches are allocated separately. Treaty fishermen may harvest 50% of the runs in the Columbia River without limiting the treaty take in the tributaries, such as Idaho's rivers. Counting the harvests separately, Idaho contends, amounts to "double dipping."
 
 
 40
 Idaho's argument is grounded in the holding of the Supreme Court in Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, that "[b]oth sides have a right, secured by treaty, to take a fair share of the available fish." 443 U.S. at 684-85, 99 S.Ct. at 3074. The "harvestable portion of each run that passes through a 'usual and accustomed' place" should be divided "into approximately equal treaty and nontreaty shares." Id. at 685, 99 S.Ct. at 3074. The "maximum possible allocation to the Indians is fixed at 50%," id. at 686, 99 S.Ct. at 3075, regardless of where the fish are taken. Id. at 687, 99 S.Ct. at 3075.
 
 
 41
 Deviations from this exact formula have been tolerated to accommodate the complex sharing required by the unique nature of the Columbia River runs and the parties that are entitled to share it. See United States v. Oregon, 718 F.2d at 301-02 (60% treaty-40% nontreaty to compensate for nontreaty ocean fishery). The district court reasoned that the plan's sharing formula was similarly fair for the system as a whole. To alter the ratios for a "subplan" could upset the delicate balance achieved among the parties. A consent decree need not include all of the obligations authorized by law, so long as it is reasonable. The district court examined this aspect of the plan and concluded it was reasonable. We agree.
 
 III
 Shoshone-Bannock Opposition to the Plan
 
 42
 The Shoshone-Bannock tribes (the Shoshone) are located along the Salmon River, a tributary of the Snake River, in Idaho. They participated in the negotiations but did not sign the plan, in part because their treaty rights have not been finalized and therefore are not defined in the plan.[8] Like Idaho, they argue that the plan should be rejected for both procedural and substantive reasons.
 
 A. Procedural Claims
 
 43
 The Shoshone, like Idaho, argue that the plan was in essence a consent decree. We agree that this characterization fits the plan. The Shoshone allege, however, that the negotiations leading to the plan were collusive, defeating any presumption of validity.
 
 
 44
 The Shoshone make numerous factual allegations. They charge that the United States and other parties colluded to exclude them from negotiations and held secret meetings regarding the Salmon River basin allocations. They argue that after intervention, they tried to present their treaty rights to the other parties but were ignored and the United States interpreted their rights restrictively, even to the court. They further argue that in light of the historical record of their exclusion, the court should have more carefully scrutinized the present proceedings.
 
 
 45
 The district court's role in reviewing the essentially private agreement among the parties is "limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties." Officers for Justice, 688 F.2d at 625. The district court, examining the record, made such a determination. It concluded that though the negotiations were marked by dispute, they were not fundamentally unfair. In light of the limited record provided by the Shoshone, we find that the court's conclusion was not clearly erroneous.
 
 B. Legality of the Plan
 
 46
 The Shoshone next argue that the plan violates legal standards because it does not protect their treaty rights or provide for necessary conservation.
 
 1. Treaty rights
 
 47
 The Shoshone treaty rights have been recognized to include the right to fish, but have not been more specifically defined. To accommodate the Shoshone, the district court amended the plan to ensure them full participation despite their uncertain status. The other parties recognize that Shoshone treaty rights should be protected, and the agreement is designed to incorporate those treaty rights when finalized.
 
 
 48
 The Shoshone object that these provisions are not adequate because the plan still does not grant them "equal protection." Though they may now participate as a "management entity," the committee structure established by the plan remains majoritarian. The "strategically located" downstream tribes can dominate allocation of the runs.
 
 
 49
 The Shoshone seek substantive protection for their interests, but they do not present a concrete proposal. They do request, however, that the plan be limited to one-year periods to allow them greater involvement.
 
 
 50
 The district court considered these arguments and concluded that the Shoshone are treated like any other tribe under the plan. No party controls or participates in all the subplans and the Shoshone are not barred from any governing committees. Their treaty rights are recognized and are not violated by the plan. The court determined that it should not create an exception for a single tribe. This determination was not an error of law. In light of the record before us, we find no abuse of discretion.
 
 2. Conservation
 
 51
 The Shoshone next argue that the plan is not in the public interest because it does not foster cooperation or conservation. The Shoshone do not request a larger share of fish for themselves but worry that the plan is "harvest-driven" and will not protect the fish that spawn in their waters.
 
 
 52
 The Shoshone propose two solutions. First, they suggest that the plan should be coordinated with the Northwest Power Planning Council, a congressionally established body that oversees operation of dams and fish hatcheries. The Shoshone argue that the council's regional view will better protect and rebuild the runs. However, Congress has not entrusted the council with the task of allocating regional fisheries. Furthermore, the district court concluded that the reach of this lawsuit was not regional. The district court has discretion to control the course of proceedings before it. See Natural Resources Defense Council v. Costle, 561 F.2d 904, 911 (D.C.Cir.1977). This decision was within that discretion.
 
 
 53
 In the alternative, the Shoshone suggest again that the plan operate for one-year periods only. The district court rejected this proposal as too costly because it would be a significant alteration of the plan. Numerous review procedures are built into the plan and the court has retained continuing jurisdiction with which it can evaluate future conservation needs. Our review of the record "does not leave us with the definite and firm conviction that a mistake has been committed." United States v. Oregon, 718 F.2d at 305 (internal quotations and citations omitted).
 
 IV
 Makah Motion to Intervene
 
 54
 The Makah Indian Tribe is not a party to this action and seeks to intervene. The Makah state that they tried unsuccessfully for some time to participate in the Oregon negotiations. However, they never officially sought to intervene before because they were reassured that the ocean catch was not a subject of the negotiations. Nevertheless, after publication of the final draft of the 1988 plan, it was evident that limits on the ocean harvest were important to the success of the plan. At the time of the approval hearings, the Makah presented objections to the plan and also brought a motion under Fed.R.Civ.P. 24 to intervene as of right or in the alternative for permissive intervention.
 
 A. Intervention as of Right
 
 55
 Fed.R.Civ.P. 24(a)[9] establishes four requirements for intervention as of right: timeliness; an interest relating to the subject of the action; practical impairment of the party's ability to protect that interest; and inadequate representation by the parties to the suit. Portland Audubon Soc'y v. Hodel, 866 F.2d 302, 308 (9th Cir.1989). The rule is construed broadly in favor of applicants for intervention. United States v. Oregon, 839 F.2d 635, 637 (9th Cir.1988) (unrelated case) (residents of institution allowed to intervene).
 
 
 56
 The district court denied the Makah motion to intervene as untimely, prejudicial to the parties, and inappropriate because the Makah fishery is directly regulated by the PFMC and their proper remedy was with that body. The court further held that the geographical scope of the suit would not extend past the mouth of the Columbia River and that the plan did not bind the federal officials who signed it. We review a district court's denial of a motion to intervene as of right de novo, United States v. Stringfellow, 783 F.2d 821, 825 (9th Cir.1986), cert. dismissed sub nom. Stringfellow v. Concerned Neighbors in Action, 478 U.S. 1030, 107 S.Ct. 10, 92 L.Ed.2d 765 (1968), except the question of timeliness, which is reviewed for abuse of discretion. NAACP v. New York, 413 U.S. 345, 366, 93 S.Ct. 2591, 2603, 37 L.Ed.2d 648 (1973); United States v. Oregon, 745 F.2d at 552.
 
 1. Timeliness
 
 57
 Timeliness is the threshold requirement for intervention. We consider three criteria to evaluate timeliness: the stage of the proceeding, prejudice to other parties, and the reason for and length of the delay. United States v. Oregon, 745 F.2d at 552.
 
 
 58
 a. Stage of the proceeding. Although this action had been underway for nearly twenty years when the Makah sought to intervene, the length of time that has passed since a suit was filed does not alone determine timeliness. See NAACP, 413 U.S. at 366, 93 S.Ct. at 2603. The Makah argue that since adoption of the plan commences a new stage in the action, they should be allowed to intervene at least for future proceedings. Courts have allowed intervention after entry of consent decrees, but chiefly in the remedial phase of discrimination suits where the decree had an unexpected effect on a nonparty. See United States v. City of Chicago, 870 F.2d 1256, 1259-60 (7th Cir.1989) (decree affects intervenors' chances of promotion); Howard v. McLucas, 782 F.2d 956, 959-60 (11th Cir.1986) (same); Hodgson v. United Mine Workers of America, 473 F.2d 118, 129 (D.C.Cir.1972)(remedial phase of labor dispute). These courts have generally specified that no previously litigated issues may be reopened. See id.
 
 
 59
 This is not, however, the "remedial phase" of a dispute. We have held in other contexts that waiting until after entry of a consent decree weighs heavily against intervention. County of Orange v. Air California, 799 F.2d 535, 538 (9th Cir.1986)(entry of settlement after five years of litigation preceded by well-publicized negotiations is too late a stage to intervene), cert. denied, 480 U.S. 946, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987). Similarly, intervention on the eve of settlement may be untimely. Aleut Corp. v. Tyonek Native Corp., 725 F.2d 527, 530 (9th Cir.1984).
 
 
 60
 The Makah next argue that intervention in an ongoing proceeding cannot be judged by the same criteria as a more limited lawsuit. In support, they cite Dowell v. Board of Educ., 430 F.2d 865, 868 (10th Cir.1970). However, in that case the movants had previously been allowed to intervene temporarily, were treated as parties, and had attended all hearings before requesting full intervention.
 
 
 61
 The Makah next argue that their intervention would be timely at least for the limited purpose of challenging the plan. On appeal, the Makah state that they wish to participate in future negotiations. However, the Makah did not originally request limited intervention. The district court concluded that there was no way to limit the involvement of the Makah to one issue.
 
 
 62
 Finally, the Makah point out that the state of Idaho, the Shoshone and now the Colville tribe have all been allowed to intervene after 15, 17 and 21 years of litigation respectively. The Makah state they are willing to accept the same conditions of intervention that were imposed on these parties. However, they cannot. One of Idaho's conditions was that it not expand the geographical scope of the suit. The Makah seek to intervene precisely to regionalize negotiations over Columbia River fish. This greatly expands the scope of the existing case.
 
 
 63
 The district court concluded that at this stage, it is too late in the proceeding to change the nature of the suit so dramatically. In light of the district court's discretion to control the course of proceedings before it, Costle, 561 F.2d at 911, this decision was not an abuse of discretion.
 
 
 64
 b. Prejudice. One of the "most important" factors in determining timeliness is prejudice to the existing parties. United States v. Oregon, 745 F.2d at 552. The district court held that intervening at this stage to challenge the plan would seriously prejudice all the parties to the suit because the plan is complex and delicately balanced. That the compromise is delicate is evident from the fact that after over four years of negotiation, certain points of the final plan are still disputed by some parties.
 
 
 65
 The Makah do not deny this but respond that the parties to the suit deceived them regarding the content of the negotiations and cannot now claim prejudice, citing Stallworth v. Monsanto Co., 558 F.2d 257 (5th Cir.1977). In that suit, however, the court found deception an "unusual circumstance" weighing in favor of intervention, but did not hold it defeated a finding of prejudice, which remained discretionary. Id. at 267.
 
 
 66
 The Makah also argue that limiting intervention for the purpose of future proceedings will not prejudice the parties' past efforts. The district court, however, reasoned that allowing intervention at this stage could still upset the delicate balance the parties have achieved, citing County of Orange, 799 F.2d at 538 ("[T]he possibility of this settlement unraveling is so prejudicial that to allow the [city] to intervene at this late date would be tantamount to disaster"). This conclusion was not an abuse of discretion.
 
 
 67
 c. Reason for and length of delay. The district court found that when the Makah moved to intervene, they provided no explanation for their delay. On appeal, the Makah correct this oversight. They argue that they delayed because they did not know that their interests would be directly affected by these proceedings.
 
 
 68
 A party seeking to intervene must act as soon as he "knows or has reason to know that his interests might be adversely affected by the outcome of the litigation." City of Chicago, 870 F.2d at 1263 (internal quotation and citations omitted). Here, the other parties contend that the Makah had ample notice of the proceedings and should have known ocean limits could be discussed. They cite, for example, the 1985-1987 annual plans, each entitled "In-River and Ocean Fishery Plan." Moreover, the Makah concede that they made frequent inquiries about the nature of the negotiations and attempted repeatedly to participate, showing they were aware there was some risk to them from the negotiations. See Alaniz v. Tillie Lewis Foods, 572 F.2d 657, 659 (9th Cir.), cert. denied, 439 U.S. 837, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978).
 
 
 69
 The Makah also argue that they were the victims of intentional deception. Courts have held that if the parties made it "more difficult for the [intervenors] to acquire information about the suit early on" they may not "now be heard to complain that the [intervenors] should have known about it or appreciated its significance sooner." Stallworth, 558 F.2d at 267; cf. Alaniz, 572 F.2d at 659 (noting absence of fraud). Because the Makah did not raise this argument before the district court, it made no finding on this subject. On the record before us, it appears the Makah were at least aware that ocean fishing might be discussed in the negotiations despite the alleged statements to the contrary by the other parties. In light of the several factors evaluated by the court, we do not find the Makah's argument that they were deceived sufficient to make the district court's decision an abuse of discretion. We affirm its decision that the Makah's motion to intervene was untimely.
 
 2. Other Elements
 
 70
 Because we affirm the district court's decision that the Makah's motion was not timely, we need not reach any of the remaining elements of the test set forth in Rule 24. County of Orange, 799 F.2d at 538. The motion to intervene was properly denied.
 
 B. Permissive Intervention
 
 71
 The Makah moved in the alternative for permissive intervention. Rule 24(b) grants the court discretion to allow intervention if "an applicant's claim or defense and the main action have a question of law or fact in common." The application must also be timely. A finding of untimeliness defeats this motion as well. County of Orange, 799 F.2d at 539. The court's denial of permissive intervention was not an abuse of discretion.
 
 C. Objections to the Plan
 
 72
 At the time of the approval hearings, the Makah submitted several objections to the plan. The district court considered these objections and approved the plan over them. Since the Makah are not parties to the suit, their status is similar to that of an amicus curiae, see Miller-Wohl Co. v. Commissioner of Labor & Industry, 694 F.2d 203, 204 (9th Cir.1982), and they may not appeal the court's decision. Moten v. Bricklayers Int'l Union, 543 F.2d 224, 227 (D.C.Cir.1976).
 
 V
 Conclusion
 
 73
 The district court's order approving the plan is affirmed, with each party to bear its own costs.
 
 
 74
 AFFIRMED.
 
 
 
 [1]
 Pub.L. No. 94-265, 90 Stat. 331 (codified at 16 U.S.C. Sec. 1801 et seq.)
 
 
 [2]
 Pub.L. No. 65-123, 40 Stat. 515 (1918). The Compact requires that all state regulation of Columbia River fisheries be consistent. Idaho is not a party to the Compact, though it has tried to join. See Idaho I, 444 U.S. at 384, 100 S.Ct. at 619
 
 
 [3]
 The Makah were guaranteed the right to fish by the Treaty of Neah Bay, 12 Stat. 939, Jan. 31, 1855. Their reservation is at the northwest corner of the Olympic Peninsula of the state of Washington
 
 
 [4]
 If such a decree is entered, a nonconsenting party is not bound by an obligation to which it did not agree. Local 93, 478 U.S. at 529, 106 S.Ct. at 3079. If a remedy is sought against a nonconsenting party, the matter must be remanded for trial. Miami, 664 F.2d at 436
 
 
 [5]
 Idaho argues that the 1988 plan threatens the species in several ways. First, the plan has no "safety net," but sets steelhead harvest levels at 32%, a rate that already threatens the species. This level is much higher than the rate of 10% or less set for other species. This rate was in effect for two years before approval of the plan; Idaho cannot yet measure the impact of those harvests, but estimates it to be high. Second, because the percentage is fixed, geographical conditions such as drought could suddenly make the rate too high. Third, the steelhead return is difficult to predict, so harvest rates must be allowed to change momentarily with actual measured return. Fourth, the plan allows the use of gill nets instead of selective fishing techniques while harvesting chinook. The steelhead become intermingled with fall chinook, an abundant stock, and the nets catch both. Finally, the "emergency" measures built into the plan require further negotiation and will require delay, making them tantamount to establishing an "imminent extinction" standard
 
 
 [6]
 Idaho has disclaimed any intent to assert any claims directly against the states in this lawsuit. United States v. Oregon, 745 F.2d at 553
 
 
 [7]
 In 1987, for example, the weakest run was from the Spring Creek Hatchery, located above Bonneville Dam. The run had been decimated several years earlier by an outbreak of disease. See generally Goodman, Preserving the Genetic Diversity of Salmonid Stocks: A Call for Federal Regulation of Hatchery Programs, 20 Envtl.L. 111, 137 (1990)
 
 
 [8]
 The Shoshone were guaranteed the right to hunt by the Fort Bridger Treaty. 15 Stat. 673, July 3, 1868. The treaty has been construed to include the right to fish. State v. Tinno, 94 Idaho 759, 497 P.2d 1386 (1972)
 
 
 [9]
 Rule 24(a) reads:
 Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.