Dissent by Judge WALLACE
OPINION
McKEOWN, Circuit Judge:
Under the Clean Air Act (“the Act”), the Environmental Protection Agency (“EPA”) must establish and periodically revise national ambient air quality standards (“NAAQS”). After NAAQS are promulgated, the agency designates whether geographic areas meet those NAAQS. At issue in this appeal are the NAAQS designations for sulfur dioxide, a pollutant that causes environmental harm and health risks. When the EPA missed the statutory deadline to' issue its designations, the Sierra Club sued to force agency action. The EPA and the Sierra Club ultimately resolved them claims through a Consent Decree that set a schedule for the EPA to promulgate designations. After a detailed hearing, consideration of objections, and publication of the proposed Consent Decree in the Federal Register, the district court approved the settlement as “fair, adequate and reasonable.”
Although styled as a Consent Decree, the settlement between the EPA and the plaintiffs, the Sierra Club and the Natural Resources Defense Council (collectively, the “Sierra Club”), can best be described as a standstill, or non-suit, agreement: so long as the EPA follows the agreed-upon designation schedule, the Sierra Club will not move forward with its suit. The agreement does not modify the EPA’s statutory obligations, nor does it affect or bind the several states (the “States”) that intervened in the suit and objected to the settlement. The States may pursue a parallel lawsuit that some of them previously initiated in North Dakota or otherwise advance their claims elsewhere. We affirm the district court’s approval of the Consent Decree.
Background
The Act is intended “to protect and enhance” the country’s air resources “to promote the public health and welfare and the [nation’s] productive capacity,” which it seeks to accomplish by allocating implementation and enforcement activities between the federal and state governments. 42 U.S.C. § 7401. One of the Act’s provisions aimed at reducing air pollution requires the EPA to set NAAQS that relate to the permissible ambient concentration of certain pollutants considered harmful to public health and the environment. Id. §§ 7408-7410. Each state has the primary responsibility for ensuring that the air quality within its boundaries meets and remains within the NAAQS for each pollutant. Id. § 7407(a).
The EPA is directed to review the NAAQS every five years and revise them as appropriate. Id. § 7409(d). Within one year of the EPA’s promulgation of revised *1065 NAAQS for a pollutant, each state must submit recommended designations for areas within the state. Id. § 7407(d)(1)(A). A region may be given one of three designations: (1) “attainment,” for areas that meet the NAAQS; (2) “nonattainment,” for areas that do not meet the NAAQS; or (3) “un-classifíable,” for areas that “cannot be classified on the basis of available information as meeting or not meeting the [NAAQS].” Id.
What happens next is the genesis of the dispute before us. After the states submit recommended designations, the EPA must promulgate the designations of all regions “as expeditiously as practicable, but in no case later than 2 years from the date of promulgation” of the revised NAAQS. Id. § 7407(d)(1)(B). Congress provides a limited extension for “up to one year” when the agency “has insufficient information to promulgate the designations.” Id.
In June 2010, the EPA revised the primary NAAQS for sulfur dioxide, a gas emitted chiefly when combusting fossil fuels and high-sulfur-containing fuels. Although the precise details of the revised NAAQS are not important for our purposes, this revision caused unique challenges for the collection of relevant emissions data.
Within the year, the States[1] complied with their obligations and recommended designations for the revised NAAQS. In August 2012, in part because data collection challenges stemming from the revised NAAQS resulted in insufficient data, the EPA opted for the one-year statutory extension to June 2013. See id. § 7407(d)(1)(B). The EPA also began consulting with stakeholders about the best way to address the data challenges posed by the revised NAAQS, which eventually culminated in the EPA’s promulgation of the Data Requirements Rule. See Data Requirements Rule for the 2010 1-Hour Sulfur Dioxide (S02) Primary National Ambient Air Quality Standard (NAAQS) (“Data Requirements Rule”), 80 Fed. Reg. 51,052 (Aug. 21, 2015) (to be codified at 40 C.F.R. pt. 51). However, by August 2013— after the EPA’s deadline had expired — the agency had designated only 29 areas, leaving undesignated more than 3,000 counties throughout the country.
In August 2013, the Sierra Club sued the EPA in the Northern District of California under the Act’s citizen-suit provision, 42 U.S.C. § 7604(a)(2), seeking to compel the EPA to issue designations. Shortly after, the States moved to intervene, asserting that their “claims against [the] EPA will address [the] EPA’s failure to promulgate [sulfur dioxide] NAAQS attainment designations in the time frame mandated by the [Act]” and that they “have a significant protectable interest in the terms of any remedial order or settlement that might result from th[e Sierra Club’s] case.” Nevada, North Dakota, South Dakota, and Texas had previously filed their own citizen suit in the District Court of North Dakota seeking the same relief, and that suit was stayed pending the resolution of the case in California,
A month after the States asked to join the California suit, the Sierra Club moved for summary judgment in an effort to speed up the EPA’s publication of designations. The EPA acknowledged that it missed the three-year deadline. With no dispute on liability, the district court granted the Sierra Club’s summary judgment motion. The court also granted the States’ motion to intervene.
*1066 The district court ordered the parties to confer on an appropriate remedy. The parties briefed proposed remedies and engaged in multiple settlement discussions over several months, including at least ten joint settlement conferences. Although efforts to reach a global resolution among the EPA, the Sierra Club, and the States failed, the Sierra Club and the EPA agreed to a settlement that the States declined to join. Under that settlement, the EPA must roll out designations in three, phases, with the final promulgation of designations no later than December 31, 2020 — more than seven years after the June 2013 deadline set by the Act’s framework in 42 U.S.C. § 7407(d)(1)(B).
The Sierra Club and the EPA submitted a proposed Consent Decree to the district court and published the Consent Decree in the Federal Register for notice and comment. Proposed Consent Decree, Clean Air Act Citizen Suit, 79 Fed. Reg. 31,325 (June 2, 2014). More than one hundred comments — including some by the States that are interveno'rs here — were submitted in response to the proposed Consent Decree. After a hearing in which the States participated, the court entered the Consent Decree over the States’ objection. Significantly, the.court saw no barrier to the States pursuing relief or claims in other actions regarding the EPA’s tardy designations.
On appeal, the States raise three main objections to the Consent Decree. They argue that the Consent Decree improperly disposes of their claims, imposes duties and obligations on the States without their consent, and is not “fair, adequate and reasonable” because its deadlines far exceed the Act’s three-year period to promulgate designations.
Analysis
Our analysis of the Consent Decree is framed by the Supreme Court’s teaching in Local No. 93, International Association of Firefighters v. City of Cleveland (“Local No. 93”), 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). In a discrimination suit brought by minority firefighters against the- City of Cleveland, the union representing most of the city’s firefighters intervened and objected to the settlement. The Supreme Court explained that the consent decree was properly entered over the objections because “one party — whether an original party, a party that was joined later, or an intervenor — c[annot] preclude,other parties from settling their own disputes and thereby withdrawing from the litigation.” Id. at 528-29, 106 S.Ct. 3063 (emphasis added); see also id. at 504-06, 106 S.Ct. 3063; United States v. Carpenter, 526 F.3d 1237, 1240 (9th Cir. 2008) (“We recognize that the intervenors whose claims are not the subject of a settlement cannot veto that settlement.”). Thus, an intervenor must be heard on whether to approve a consent decree, but it cannot stop other litigants from resolving their dispute by withholding its consent to a decree. Local No. 93, 478 U.S. at 529, 106 S.Ct. 3063.
In other words, the States cannot block the Consent Decree between the Sierra Club and the EPA simply because they disagree with its terms. The Supreme Court adopted this approach for good reason; otherwise, one party could hold the other parties hostage in ongoing litigation, and a global settlement or judgment, would be the only option. The rule is especially applicable here because the States were part of the hearing on the proposed Consent Decree; briefed the proposed remedy; publicly commented on the proposed Consent Decree, which was published in the Federal Register; and participated in multiple settlement conferences. The notion that the Consent Decree breezed through without the States’ input or due consideration by the.district court is belied by the *1067 record. The district court’s thoughtful and detailed order addresses the very issues the States raise on appeal- See Order Granting Joint Motion to Approve and Enter Consent Decree and Denying Other Motions as Moot, Sierra Club v. McCarthy, No. 13-cv-03953-SI, 2015 WL 889142 (N.D. Cal. Mar. 2, 2015), ECF No. 162.
That said, it is well-established that “[a] court’s approval of a consent decree between some of the parties ... cannot dispose of the valid claims of nonconsent-ing intervenors.” Local No. 93, 478 U.S. at 529, 106 S.Ct. 3063; E.E.O.C. v. Pan Am. World Airways, Inc., 897 F.2d 1499, 1506 (9th Cir. 1990) (“It is fundamental to our notions of due process that a consent decree cannot prejudice the rights of a third party who fails to consent to it.”).
The Consent Decree leaves the States’ claims intact. By its very terms, the Consent Decree does not dispose of or prejudice the States’ independent claims; Nowhere in the Consent Decree are the States’ claims or grievances identified or even referenced. To the extent that the Consent Decree asserts that the Sierra Club and the EPA “have agreed to a settlement of this action” or that the Consent Decree is “an adequate and equitable resolution of all the claims in this matter,” that language refers only to the action and claims between the Sierra Club and the EPA. Additionally, the Consent Decree does not limit the EPA’s rights in lawsuits against third parties: “[njothing in the terms of this Consent Decree shall be construed to waive any remedies or defenses the parties may have” under the Act, and nothing in the Consent Decree attempts to circumscribe the rights of the States or other third parties against the EPA. Importantly, the district court recognized that the Consent Decree had no bearing on the States’ claims, noting that “those [States] will still be free to pursue earlier deadlines in [other] actions.”[2]
Recognizing that the Consent Decree does not actually extinguish their claims, the States shift gears slightly to assert that the Consent Decree impermis-sibly saddles them with legal duties or obligations. Were that true, the States might have a winning argument, as a consent decree “may not impose duties or obligations on a third party, without that party’s consent.” Local No. 93, 478 U.S. at 529, 106 S.Ct. 3063; United States v. Oregon, 913 F.2d 576, 582 n.4 (9th Cir. 1990). However, as the States ultimately acknowledge, the Consent Decree does not subject them to any explicit obligations: it does not mandate any specific state action, and only the Sierra Club and the EPA can be held in contempt' for failure to comply with the Consent Decree’s terms. See Local No. 93, 478 U.S. at 529-30, 106 S.Ct. 3063.
The States’ argument can best be read as a claim that the Consent Decree forces indirect duties and obligations on them. This tack also fails because a careful look at the briefing reveals that the States’ objection is with the obligations imposed by the Data Requirements Rule, not the Consent Decree. Indeed, the Data Requirements Rule, which was promulgated under agency rulemaking procedures including notice and comment, requires the States to submit specific data reporting under the revised NAAQS. See Data Requirements Rule, 80 Fed. Reg. at 51,064.
*1068 Although the Consent Decree references the Data Requirements Rule, it does not impose any of that rule’s substantive obligations on the States. That is, the Consent Decree cannot and does not “permanently and substantially amend[] an agency rule that would have otherwise been subject to statutory rulemaking procedures.” Conservation Nw. v. Sherman, 715 F.3d 1181, 1187 (9th Cir. 2013). Instead, the terms of the Consent Decree operate independently: the Consent Decree’s deadlines would remain in effect even if the Data Requirements Rule had not been promulgated, and the Data Requirements Rule would still obligate the States to submit additional emissions data in absence of the Consent Decree. The States cannot use the Consent Decree to launch a backdoor challenge against this duly promulgated agency rule.
In the end, what the States really take issue with is that the EPA blew the deadline to promulgate NAAQS designations and that the deadlines outlined in the Consent Decree are not “fair, adequate and reasonable.” See Oregon, 913 F.2d at 580. That failure to comply with the statutorily prescribed timeline — and the EPA’s continued failure to remedy the problem — has left the States in their alleged planning purgatory. But it is not the Consent Decree that inflicts this “regulatory limbo.” The Consent Decree merely gives the latest dates — vis-á-vis the agreement with the Sierra Club — for the EPA to promulgate the designations. The settlement between the Sierra Club and the EPA is not the reason behind the States’ waiting game.
As a practical matter, had the EPA met the deadlines, there would not be a lawsuit over the deadlines or a need to establish a new baseline for compliance. The Act does not prescribe a remedy for default, and, as the district court observed, “the appropriate remedy in a ‘deadline’ case such as this is to require [the] EPA to issue designations pursuant to a schedule, not to mandate that [the] EPA issue any particular designation.” Rather than impose a particular substantive outcome, the district court approved a consent decree that simply compels action by the EPA. See Brock v. Pierce Cty., 476 U.S. 253, 260 & n.7, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986); Sierra Club v. EPA, 762 F.3d 971, 981 & n.5 (9th Cir. 2014). The EPA is no stranger to consent decrees that set deadlines after it fails to timely promulgate designations. See, e.g., Miss. Comm’n on Envtl. Quality v. EPA, 790 F.3d 138, 158 (D.C. Cir. 2015) (per curiam) (enforcing a consent decree’s deadlines and noting that “[t]he EPA entered into the consent decree precisely to settle allegations that it had already missed the Act’s statutory deadlines for promulgating the 2008 ozone NAAQS designations”); Nat. Res. Def. Council v. EPA, 777 F.3d 456, 461-63, 467 (D.C. Cir. 2014) (“EPA entered into consent decrees aimed to enforce those provisions [related to the promulgation of designations] under which it agreed to promulgate revised NAAQS by March 2008 and to issue designations by May 2012.”). The district court did not abuse its broad authority in concluding that the Consent Decree “is fair and reasonable, both procedurally and substantively, and consistent with the Clear Air Act, and other applicable law.” See Oregon, 913 F.2d at 580; Alaska Ctr. for Env’t v. Browner, 20 F.3d 981, 986-87 (9th Cir. 1994) (highlighting a district court’s “broad latitude” to fashion equitable relief).
Nothing can put the genie back in the bottle now that the EPA has missed the promulgation deadline, but the Consent Decree leaves the States free to pursue their claims in other litigation and to argue for even shorter timelines for agency action. In its order, the district court reiterated the representation by the Sierra Club and the EPA that “[a]ny decision by this *1069 Court to enter the proposed consent decree would not, in and of itself, result in the dismissal of the Plaintiff-Intervenors’ claims in those suits. That is, if the Court enters the proposed consent decree here, those parties will still be free to pursue earlier deadlines in those actions....” At oral argument, the States acknowledged that they could pursue their pending claims in the North Dakota litigation. And North Carolina, which is not a party to this appeal, is already pursuing its claims in federal court in North Carolina. Put simply, the States cannot have it both ways: they cannot try block the Consent Decree by arguing that it improperly disposes of their claims while simultaneously asserting that they can pursue those claims in another forum such as the district court in North Dakota.
In sum, as long as the EPA sticks to the schedule in the Consent Decree, the Sierra Club will not advance its lawsuit against the EPA. The Consent Decree does not prohibit the EPA from promulgating designations prior to those deadlines, nor does it otherwise constrain the agency’s discretion. The States may have a complaint against the EPA for failure to adhere to the Act’s schedule for promulgating the designations for sulfur dioxide NAAQS, but they cannot legitimately claim that the terms of the Consent Decree, as opposed to the EPA itself, are to blame for their predicament. Because the Consent Decree “does not bind [the States] to do or not to do anything,” “imposes no legal duties or obligations on th[em] at all,” and “does not purport to resolve any claims the[y] might have,” the States cannot block the Consent Decree merely by withholding their consent. See Local No. 93, 478 U.S. at 529-30, 106 S.Ct. 3063.
AFFIRMED.

. The states in this appeal are Arizona, Kentucky, Nevada, North Dakota, Louisiana, and Texas. North Carolina filed a complaint-in-intervention, but it is not a party to this appeal. As discussed in note 2, North Carolina is now pursuing a separate action against the EPA for its failure to promulgate sulfur dioxide designations.

. As to North Carolina, the district court noted that the Consent Decree “provides North - Carolina with the relief sought, namely a binding schedule to issue all remaining designations.” Notwithstanding this observation, North Carolina is currently litigating its claims against the EPÁ in the Eastern District of- North Carolina. North Carolina v. McCarthy, 5:13-cv-00710-FL (E.D.N.C. Med Oct. 9, 2013).