NORTHWEST FOREST RESOURCE COUNCIL, an Oregon corporation, Plaintiff–Appellee,

v.

Daniel GLICKMAN, in his capacity as Secretary of Agriculture; Bruce Babbitt, in his capacity as Secretary of the Interior, Defendants,

and

Oregon Natural Resources Council; Sierra Club, Inc.; Pilchuck Audubon Society; Western Ancient Forest Campaign; Portland Audubon Society; Black Hills Audubon Society; and Headwaters, Intervenors–Appellants.

NORTHWEST FOREST RESOURCE COUNCIL, an Oregon corporation, Plaintiff–Appellee,

v.

Daniel GLICKMAN, in his capacity as Secretary of Agriculture; Bruce Babbitt, in his capacity as Secretary of the Interior, Defendants–Appellants,

and

Oregon Natural Resources Council, Inc.; Sierra Club, Inc.; Pilchuck Audubon Society; Western Ancient Forest Campaign; Portland Audubon Society; Black Hills Audubon Society; and Headwaters, Intervenors.

Nos. 95–36038, 95–36042.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 8, 1996.

Decided April 24, 1996.

As Amended on Denial of Rehearing May 30, 1996.

Albert M. Ferlo, Jr., United States Department of Justice, Washington, DC, for defendants-appellants.

Patti A. Goldman and Kristen L. Boyles, Sierra Club Legal Defense Fund, Seattle, Washington, for intervenors-appellants.

Mark C. Rutzick and Alison Kean Campbell, Portland, Oregon, for plaintiff-appellee.

Before: JOHN T. NOONAN, Jr., LEAVY and HAWKINS, Circuit Judges.

MICHAEL DALY HAWKINS, Circuit Judge:

We consider what would appear to be a relatively straightforward question of statutory interpretation with fairly profound consequences. This appeal requires us to determine the relationship between two separate statutory provisions governing timber sales, Section 2001(k)(1) of the Fiscal Year 1995 Emergency Supplemental Appropriations for Disaster Relief and Rescissions Act, and Section 318 of the Department of the Interior and Related Agencies Appropriations Act. In particular, we must determine the meaning of the phrase "subject to [S]ection 318" as it appears in Section 2001(k)(1) of the 1995 Rescissions Act. It is not our role to determine the wisdom of Section 2001(k)(1), only its meaning.

This appeal consolidates two cases arising out of the same set of events but involving two distinct legal issues.[1] The first appeal requires us to define the categories of timber sales the Secretaries of Agriculture and Interior must release under Section 2001(k)(1) of the 1995 Rescissions Act. The Northwest Forest Resource Council ("NFRC"), a timber industry trade association, contends Section 2001(k)(1) mandates that the Secretaries release several years of timber sales in federal lands that are defined by a separate statute, Section 318 of Public Law No. 101–121 (estimated at 656 million board feet). The Secretaries urge that Section 2001(k)(1) requires them to release only sales for fiscal years 1989 and 1990 (an estimated 410 million board feet). They appeal the district court's order adopting NFRC's interpretation of Section 2001(k)(1), and its permanent injunction directing the Secretaries to release timber sale contracts offered or awarded between October 1, 1990 and July 27, 1995.

We have jurisdiction over the Secretaries' appeal pursuant to 28 U.S.C. § 1292(a)(1).

In the second appeal, Oregon Natural Resources Council and several other environmental organizations (collectively "ONRC") challenge the district court's refusal to allow ONRC to intervene in NFRC's lawsuit against the Secretaries. The denial of a motion to intervene is appealable as of right. *Stringfellow v. Concerned Neighbors in Action,* 480 U.S. 370, 107 S.Ct. 1177, 94 L.Ed.2d 389 (1987); *United States v. Oregon,* 913 F.2d 576, 587 (9th Cir.1990), *cert. denied by Makah Indian Tribe v. United States,* 501 U.S. 1250, 111 S.Ct. 2889, 115 L.Ed.2d 1054 (1991).

For the reasons discussed below, we affirm the district court's order directing the Secretaries to release "all timber sale contracts offered or awarded between October 1, 1990 and July 27, 1995, in any national forest in Oregon and Washington or [Bureau of Land Management] district in western Oregon," and we affirm the district court's partial denial of ONRC's motion to intervene in NFRC's declaratory action against the Secretaries.

## FACTUAL BACKGROUND

### I. Northwest Forest Resource Council's Declaratory Action

#### A. The Enactment of the 1995 Rescissions Act

On July 27, 1995, the President signed into law the Fiscal Year 1995 Emergency Supplemental Appropriations for Disaster Relief and Rescissions Act, Pub.L. 104–19, 109 Stat. 240 (1995). Though principally an appropriations bill, the Act contained several provisions aimed at expediting the award of timber harvesting contracts, including provisions authorizing the nationwide release of salvage timber sales (Section 2001(b)), expediting the award of timber sales covered in the President's Northwest Forest Plan (Section 2001(d)), and releasing previously authorized timber sales (Section 2001(k)(1)).

---

1. The two appeals were consolidated and expedited upon motion of several environmental or-

ganizations seeking to intervene in the litigation.

This appeal concerns the scope of Section 2001(k)(1) of the Act, which requires that within 45 days of the Act's enactment,[2] the Secretaries of Agriculture and Interior must release "all timber sale contracts offered or awarded before [the Act's enactment] in any unit of the National Forest System or district of the Bureau of Land Management subject to section 318 of Public Law 101–121." Because Section 2001(k)(1) defines its mandatory timber releases by reference to Section 318 of the Department of the Interior and Related Agencies Appropriations Act, Fiscal Year 1990, Pub.L. 101–121, 103 Stat. 745 (1989), we must first examine the scope of timber sales under Section 318.

### B. Timber Sales Authorized by Section 318

Enacted in October 1989, Section 318 mandated an "aggregate timber sale level" for timber harvests cut from National Forest Service and Bureau of Land Management lands in Oregon and Washington during fiscal years 1989 and 1990. § 318(a)(1).

Subsections 318(a)(1) and 318(a)(2) directed the Forest Service and the Bureau of Land Management to meet specified timber sales quotas from two geographical categories. Subsection 318(a)(1) provided that the bulk of timber sales must derive from "the thirteen national forests in Oregon and Washington known to contain northern spotted owls[.]" § 318(a)(1). Other subsections of the statute imposed various environmental and procedural requirements on these sales. *See* Subsections 318(b)–(j). Subsection 318(a)(2) authorized additional sales in the Bureau of Land Management's "administrative districts in western Oregon." The stat-ute explicitly exempted Subsection 318(a)(2) sales from the procedural and substantive protections of Subsections 318(b)–(j). *See* § 318(i).

Implementation of Section 318 sales was delayed, however, by several lawsuits alleging Section 318 violated various federal environmental statutes.[3] Although Section 318 expired by its own terms on September 30, 1990, it provided for sales it had authorized, but which were not finalized until after it expired. Subsection 318(k) required that sales remaining to be released after the expiration date were to remain "subject to the terms and conditions of [Section 318] for the duration of those sale contracts." § 318(k). As of the enactment of Section 2001(k)(1) of the 1995 Rescissions Act, an estimated 410 million board feet of timber remained to be released under Section 318.

### C. Northwest Forest Resource Council's Declaratory Action

On August 8, 1995, after the 1995 Rescissions Act was enacted but before the September 10 release date, NFRC brought the declaratory action below (No. 95–36042). NFRC sought the release, under Section 2001(k)(1), of "all timber sales offered prior to the date of enactment [of the 1995 Rescissions Act] in all national forests in Oregon and Washington and in Bureau of Land Management districts in western Oregon."[4] NFRC argued that Section 2001(k)(1)'s term "subject to Section 318" describes only Section 318's geographical boundaries, but does not incorporate Section 318's chronological limits (fiscal years 1989 and 1990). Under this interpretation, Section 2001(k)(1) re-

---

2. Section 2001(k)(1) provided that timber sales were to be released starting September 10, 1995.

3. Litigation included a challenge to the constitutionality of Section 318, *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992); litigation over compliance with the terms of Section 318, *Seattle Audubon Soc'y v. Robertson*, Civ. Nos. 89–160, 89–99, 1991 WL 180099 (W.D.Wash. March 7, 1991); and challenges to Section 318 sales based on concerns about their impact on species listed under the Endangered Species Act (including the northern spotted owl and the marbled murrelet).

4. NFRC subsequently added other claims to its lawsuit. First, it added a claim under Section 2001(k)(2), which exempts from Section 2001(k)(1) those forests in which threatened or endangered bird species are "known to be nesting." This claim challenged the Secretaries' proposed interpretation of Section 2001(k)(2), and sought the release of sales withheld under Section 2001(k)(2), absent physical evidence of nesting. Second, NFRC challenged the Forest Service's refusal to release FY 1990 sales it conceded were within the scope of Section 2001(k)(1). These additional claims are not at issue in this appeal.

quires the Secretaries to release sales occurring after fiscal years 1989 and 1990, but before enactment of the 1995 Rescissions Act. This interpretation would entail the release of 246 million board feet of timber over and above the 410 million board feet Section 318 authorized for release in fiscal years 1989 and 1990.

As part of its declaratory action, NFRC sought a permanent injunction compelling the Secretaries "to award, release, and permit to be completed in fiscal years 1995 and 1996 ... *all* timber sales offered prior to July 27, 1995 in *all* national forests in Oregon and Washington and [Bureau of Land Management] districts in western Oregon, *including the FY 1991–1995 sales.*" (emphasis added). It also sought a temporary restraining order requiring the Secretaries to "take all administrative actions" necessary to release the sales by September 10.

### D. The District Court's Order and Permanent Injunction

The district court denied NFRC's motion for a temporary restraining order but granted summary judgment for NFRC, adopting its suggested interpretation of Section 2001(k)(1). The district court also granted NFRC's motion for a permanent injunction, directing the Secretaries "to award, release, and permit to be completed in fiscal years 1995 and 1996 ... *all timber sale contracts offered or awarded between October 1, 1990 and July 27, 1995,* in *any* national forest in Oregon and Washington or [Bureau of Land Management] district in western Oregon, except for sale units in which a threatened or endangered bird species is known to be nesting." (emphasis added).

The Secretaries appealed the district court's summary judgment order and permanent injunction. Their appeal was expedited

and consolidated with ONRC's appeal from the district court's denial of its motion to intervene. The district court denied the Secretaries' motion to stay the injunction pending this appeal, and a motions panel of this Court denied the Secretaries' request for an emergency stay pending appeal.

### II. Oregon Natural Resources Council's Motion to Intervene in Northwest Forest Resource Council's Declaratory Action

On August 14, 1995, six days after NFRC sued the Secretaries, ONRC moved to intervene in NFRC's declaratory action, seeking, alternatively, intervention as of right or permissive intervention.[5] The district court denied ONRC's motion to intervene but did allow ONRC to participate as amicus curiae, both in the summary judgment hearing and in NFRC's subsequent attempts to enforce the order against the Secretaries.[6] ONRC appeals the district court's partial denial of its motion to intervene.[7]

### DISCUSSION

### I. The Scope of Section 2001(k)(1) of the 1995 Rescissions Act

■ We review de novo the district court's interpretation of Section 2001(k)(1). *Spain v. Aetna Life Ins. Co.,* 11 F.3d 129, 131 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1612, 128 L.Ed.2d 340 (1994).

■ The Secretaries' appeal requires us to determine what timber sales must be released under Section 2001(k)(1), which is purely a question of statutory interpretation. In interpreting a statute, we "look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy, to ascertain the intent of Congress. Then, if the language of the stat-

---

5. NFRC opposed ONRC's motion for three reasons: (1) ONRC's interests in the enforcement of environmental laws were irrelevant because Section 2001(k)(1) nullified those laws; (2) ONRC's interests would not be impaired by the lawsuit; and (3) the Secretaries, as defendants in the lawsuit, would adequately represent ONRC's interests. The Secretaries took no position on ONRC's motion.

6. The district court also allowed ONRC to intervene with respect to NFRC's subsequent § 2001(k)(2) claim, which is not at issue in this appeal.

7. ONRC moved successfully to expedite its appeal and to consolidate it with the Secretaries' appeal. We granted ONRC's motion to file an amicus brief in the Secretaries' appeal.

ute is unclear, we look to its legislative history." *Alarcon v. Keller Industries, Inc.*, 27 F.3d 386, 389 (9th Cir.1994) (citations omitted).

## A. The Language of Section 2001(k)(1)

We begin with the language of the statute. *United States v. van den Berg*, 5 F.3d 439, 442 (9th Cir.1993) (*citing Pennsylvania Public Welfare Dept. v. Davenport*, 495 U.S. 552, 557, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990)).

Section 2001(k)(1) provides in pertinent part:

> Notwithstanding any other provision of law, within 45 days after the date of the enactment of this Act, the Secretary concerned shall act to award, release, and permit to be completed in fiscal years 1995 and 1996, with no change in originally advertised terms, volumes, and bid prices, *all timber sale contracts offered or awarded before that date in any unit of the National Forest System or district of the Bureau of Land Management subject to section 318 of Public Law 101–121* [.]
>
> (emphasis added)

At the heart of this appeal is the meaning and effect of the phrase "subject to section 318," which defines the scope of timber sales under Section 2001(k)(1). The Secretaries and NFRC offer divergent interpretations of this phrase and therefore disagree strenuously as to the relationship between Section 2001(k)(1) and Section 318.

The Secretaries contend Congress used the phrase "subject to section 318" to require the release of only those timber sales originally offered or awarded pursuant to Section 318, but that were delayed due to the various legal challenges to that statute. In the Secretaries' view, the phrase "subject to section 318" modifies "timber sale contracts[.]" According to this interpretation, the reference to Section 318 identifies both the regions and fiscal years of the sales, and thus imposes both geographical *and* temporal limits on the scope of Section 2001(k)(1).[8]

NFRC insists, however, that the phrase "subject to section 318" modifies "any unit of the National Forest System or district of the Bureau of Land Management" and thus defines only the geographic parameters of the sales. Within that geographic area, which it construes as "the national forests of Oregon and Washington and six [Bureau of Land Management] districts in western Oregon[,]" NFRC contends the statute requires the award and release of "all timber sales offered or awarded before the date of enactment of the [1995] Rescissions Act." Under NFRC's interpretation, the timber sales are not limited to fiscal years 1989 and 1990, the period covered by Section 318, but additionally encompass sales occurring since the enactment of Section 318. The district court agreed with NFRC's interpretation of Section 2001(k)(1), and accordingly tailored its permanent injunction to cover "*all* timber sale contracts offered or awarded between October 1, 1990 and July 27, 1995, *in any national forest in Oregon and Washington or [Bureau of Land Management] district in western Oregon.*"

### 1. The Structure of Section 2001(k)(1)

The statute by its mandatory language ("shall act") requires the Secretaries to release the timber sales described therein. The timber sales that are the object of Section 2001(k)(1)'s mandate are:

> all timber sale contracts offered or awarded before [the enactment of Section 2001(k)(1)] in any unit of the National Forest System or district of the Bureau of Land Management subject to section 318[.]

The term "all" makes the mandate applicable to the entire category of "timber sale contracts" included by Section 2001(k)(1). Defining that category are two criteria: (1) the time frame, which is defined as before [2001(k)(1)'s enactment], and (2) the geographical scope, which is defined as "in any unit [of national forests or BLM lands] sub-

---

**8.** Shortly after NFRC filed its declaratory action, the Secretaries of Agriculture and Interior issued an Instruction Memorandum stating that Section 2001(k)(1) "applies only to the remaining section 318 timber sales[,]" and requires the release only of sales that were offered in fiscal years 1989 and 1990 and that met the environmental and procedural requirements of Section 318.

ject to section 318." Both criteria bear equally on "timber sale contracts."

Structured in this fashion, Section 2001(k)(1) places the phrase "subject to section 318" squarely in the portion of the sentence that modifies the geographical areas covered by Section 2001(k)(1). Given this structure, it is clear that the phrase modifies only the geographical scope of Section 2001(k)(1), but does not describe its temporal reach. The time frame of Section 2001(k)(1) is defined instead by the explicit wording of the statute: "before [the] date [of enactment of the 1995 Rescissions Act]." Section 2001(k)(1) is therefore not limited to the fiscal years covered by Section 318, but instead authorizes timber sales "offered or awarded" up until the date of enactment.

This conclusion is bolstered by another feature of Section 2001(k)(1)'s structure. The statute does not set off the phrase "subject to section 318" from the preceding phrase "in any unit [of national forests or BLM lands][.]" These two phrases are unseparated by a comma or conjunction such as "and." The absence of such a division suggests that the phrase "subject to section 318" does not modify the entire preceding portion of the sentence. Instead, the link between the phrases "in any unit [of national forests or BLM lands]" and "subject to section 318" indicates that they operate as one entity and serve one function: defining the geographic scope of Section 2001(k)(1).

The Secretaries urge that the phrase "subject to section 318" modifies "timber sale contracts" generally. They argue, first, that had Congress intended to define only the geographical scope of Section 2001(k)(1), it could have identified the national forests and Bureau of Land Management lands in the text, and need not have invoked Section 318 as "shorthand" for these areas. Although Congress certainly could have adopted that approach, the language it chose instead is a valid means to achieve the same result.

The Secretaries' next argument against reading "subject to section 318" to modify "unit[s] [of national forests or BLM lands]" is that Sections 2001(b) and 2001(d) of the 1995 Rescissions Act employ the term "described by" to identify the location of timber sales

covered in those sections. This difference is immaterial. Whether Congress had used "subject to" or "described by," it would produce the same result: Owing to its location in Section 2001(k)(1), the phrase would invariably modify "unit[s] [of national forests or BLM lands]." In the context of Section 318, units "subject to section 318" are identical to units "described by section 318": By its terms, Section 318 encompasses "the national forests of Oregon and Washington," § 318(a)(1), including "the thirteen national forests in Oregon and Washington known to contain northern spotted owls[,]" § 318(a)(1), as well as the Bureau of Land Management's "administrative districts in western Oregon." § 318(a)(2).

### 2. The Doctrine of Last Antecedent

■ Another guide in determining the role played by the phrase "subject to section 318" is the "doctrine of last antecedent," which teaches that where one phrase of a statute modifies another, the modifying phrase applies only to the phrase immediately preceding it. *Huffman v. Comm'r of Internal Revenue*, 978 F.2d 1139, 1145 (9th Cir.1992) (citations omitted); *Wilshire Westwood Associates v. Atlantic Richfield Corp.*, 881 F.2d 801, 804 (9th Cir.1989). We have long followed this interpretive principle. *See Wilshire Westwood Associates*, 881 F.2d at 804. *See also* Norman J. Singer, *Sutherland on Statutory Construction* § 47.33 (4th ed. 1985) ("[Q]ualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent.")

Applied here, the doctrine of last antecedent indicates that the phrase "subject to section 318" modifies the phrase it immediately follows: "unit[s] of the National Forest System [and] district[s] of the Bureau of Land Management." The doctrine of last antecedent thus lends further support to the conclusion that Section 318 defines only the geographic scope of timber sales required by Section 2001(k)(1), and not other characteristics of the sales.

The Secretaries contend that the doctrine of last antecedent should not apply in this case because they argue it would produce an absurd result: It would require the release of timber sales offered in forests that were

never subject to Section 318's environmental and procedural protections.

Such a result is not absurd. On the contrary, it mirrors the original provisions of Section 318. By its very terms, Section 318 accords such protections to only a subset of the sales it authorized. Section 318 mandated that certain sales quotas be met through timber sales in (1) "the thirteen national forests in Oregon and Washington known to contain northern spotted owls[,]" § 318(a)(1), and (2) the Bureau of Land Management's "administrative districts in western Oregon." § 318(a)(2). The latter category was never afforded the protections of Subsections 318(b)-(k). Indeed, Subsection 318(i) explicitly exempted Subsection 318(a)(2) sales from these protections, stating:

> [T]he provisions of this section apply solely to the thirteen national forests in Oregon and Washington and Bureau of Land Management districts in western Oregon known to contain northern spotted owls. Nothing contained in this section shall be construed to require the Forest Service or Bureau of Land Management to develop similar policies on any other forest or district in Oregon or Washington.

(emphasis added)

It is true that we are not inflexible in our application of the doctrine of last antecedent, and have recognized that the principle must yield to the most logical meaning of a statute that emerges from its plain language and legislative history. *Hearn v. Western Conf. of Teamsters Pension Trust Fund,* 68 F.3d 301, 304 (9th Cir.1995). *See also* Singer, *Sutherland on Statutory Construction* § 47.33 ("[w]here the sense of the entire act requires that a qualifying word or phrase apply to several preceding [or] succeeding sections, that word or phrase will not be restricted to its immediate antecedent."). Here, however, both the plain language of the statute and the doctrine of last antecedent bolster the conclusion that "subject to section 318" modifies only the geographical scope of Section 2001(k)(1).

### 3. The Canon of Ordinary Meaning

Having determined that the phrase "subject to section 318" modifies the phrase "in any unit [of national forests or BLM lands][,]" we next examine what the phrase "subject to section 318" means.

■ Where a statutory term is not defined in the statute, it is appropriate to accord the term its "ordinary meaning." *van den Berg,* 5 F.3d at 442. The meaning of "subject to" includes, among other things, "governed or affected by." Black's Law Dictionary, 1594 (4th ed. 1968). The phrase "subject to section 318" may therefore be interpreted as "governed or affected by section 318." In this case, the phrase identifies those geographic units that were affected by Section 318. The statute covers "the national forests of Oregon and Washington," § 318(a)(1), including "the thirteen national forests in Oregon and Washington known to contain northern spotted owls[,]" § 318(a)(1), as well as the Bureau of Land Management's "administrative districts in western Oregon." § 318(a)(2). Although the statute imposed special substantive and procedural requirements on timber sales in "the thirteen national forests in Oregon and Washington known to contain northern spotted owls[,]" § 318(a)(1), the other geographical units encompassed by the statute may nonetheless be said to be "subject to [S]ection 318."

The Secretaries urge a narrower interpretation of the phrase "subject to," and argue that it means not merely "described by" but "conditioned by." They contend that many of these land units cannot be said to have been "subject to [S]ection 318" because they were never subject to the environmental and procedural protections contained in Subsections 318(b)-(j). As discussed in the preceding section, however, that contention is clearly refuted by the explicit terms of Subsection 318(i), which limits the substantive protections contained in Subsections 318(b)-(j) to sales under Subsection 318(a)(1), and exempts Subsection 318(a)(2) sales.

### 4. The Principle of Giving Effect to Every Statutory Subsection

■ Another principle in interpreting the phrase "subject to section 318" is that a

statute must be interpreted to give significance to all of its parts. *Boise Cascade Corp. v. E.P.A.*, 942 F.2d 1427, 1432 (9th Cir.1991). We have long followed the principle that "[s]tatutes should not be construed to make surplusage of any provision." *Wilshire Westwood Associates*, 881 F.2d at 804 (*citing Pettis ex rel. United States v. Morrison–Knudsen Co.*, 577 F.2d 668, 673 (9th Cir. 1978)).

Applying that principle to this case, we find, first, that Section 2001(k)(1)'s phrase "offered or awarded before [the date of enactment of the 1995 Rescissions Act]" would be superfluous if, as the Secretaries argue, the statute was limited to timber sales in fiscal years 1989 and 1990. That phrase defines the temporal scope of timber sales under Section 2001(k)(1), and it makes clear that the statute authorizes timber sales well after fiscal years 1989 and 1990. Second, the phrase "in any unit of the National Forest System or district of the Bureau of Land Management" would be superfluous if, as the Secretaries contend, "subject to section 318" defined "timber sales" generally, since that definition would already include the geographical scope of Section 318.

The Secretaries argue that these two phrases are not superfluous because they potentially serve other functions. First, they contend the phrase "offered or awarded before [the date of enactment of the 1995 Rescissions Act]" might refer to sales that were authorized under Section 318 in fiscal years 1989 and 1990, but that were delayed by litigation. The language of this phrase does not suggest such a limited reading, however; the phrase employed is "offered or awarded," *not* "offered and awarded but delayed."

Second, the Secretaries point to the phrase "in *any unit* of the National Forest System or district of the Bureau of Land Management subject to section 318" and suggest it be interpreted to include both Forest Service and Bureau of Land Management lands. That interpretation would not solve the problem of surplusage, however, since the phrase "subject to section 318," standing alone, would include both Forest Service and Bureau of Land Management lands.

The Secretaries invoke the principle against surplusage in support of a final argu-

ment: They contend this principle supports the conclusion that *all* of Section 318's provisions should be read into Section 2001(k)(1), rather than just its geographical definition. Reading "subject to section 318" to include only Section 318's geographical parameter, they argue, would ignore the environmental and procedural protections of Section 318. As discussed above, however, not all of the geographic areas subject to Section 318 were accorded its substantive protections.

### 5. Conclusion

■ Based on the structure of Section 2001(k)(1), the plain and ordinary meaning of the words it contains, and several longstanding principles of statutory interpretation, we conclude that the language of Section 2001(k)(1) is clear: The phrase "subject to section 318" defines only the geographical reach of the statute, and clearly authorizes the release of timber sales "offered or awarded" up until the date of enactment. The Secretaries and amicus ONRC urge, however, that the legislative history of Section 2001(k)(1) provides persuasive evidence that Congress's intent in enacting this section of the 1995 Rescissions Act was to release only those timber sales that Section 318 authorized for fiscal years 1989 and 1990. We therefore turn next to the legislative history of Section 2001(k)(1).

### B. The Legislative History of Section 2001(k)(1)

■ As noted above, our approach to statutory interpretation is to look to legislative history only where we conclude the statutory language does not resolve an interpretive issue. Where a statute is ambiguous, we may look to legislative history to ascertain its purpose. *United States v. Aguilar*, 21 F.3d 1475, 1480 (9th Cir.1994) (en banc), *aff'd in part, rev'd in part,* and *remanded,* —— U.S. ——, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995). Here, although we find that the language of the statute makes clear the meaning of the phrase, "subject to section 318," we turn now to the legislative history because the Secretaries and amici urge its importance. As we do, it is important to note that this Circuit also recognizes the principle that "[l]egislative history—no matter how clear—can't

override statutory text. Where the statute's language 'can be construed in a consistent and workable fashion,' [this Court] must put aside contrary legislative history." *Hearn*, 68 F.3d at 304 (citations omitted).

### 1. The House Report Introducing the Bill

As originally introduced, Section 2001(k)(1) was described as a provision "to release a group of sales that *have already been sold under the provisions of Section 318* of the fiscal year 1990 Interior and Related Agencies Appropriations Act." H. Rep. No. 104–71, 104th Cong., 1st Sess. 20–23 (Mar. 8, 1995) (emphasis added). Although the Secretaries urge that the words "have already been sold" refers to Section 318 sales undertaken in fiscal years 1989 and 1990 only, this language, standing alone, does not so limit the provision.

### 2. The Senate Modification of the Bill

Next, the Senate modified Section 2001 by adding Section 2001(k)(2) to exempt forests containing endangered birds. During Senate debates on the 1995 Rescissions Act, which focused chiefly on the Act's controversial salvage timber provisions, only passing references were made to Section 318. Senator Gorton referred to "sales ... *pursuant to* [Section 318]," while Senator Hatfield referred to "sales, originally *authorized by* [Section 318]." 141 Cong. Rec. S4875 & S4881 (emphasis added). The Secretaries once again urge us to interpret these phrases to limit the temporal scope of Section 2001(k)(1) as enacted. This we will not do. Neither of these passing references to Section 318 squarely addresses how Section 318 modifies Section 2001(k)(1).

### 3. The Conference Report

The Conference Report on the 1995 Rescissions Act, H.R. Conf. Rep. 104–124, 104th Cong., 1st Sess. (May 16, 1995), contains the following language:

The bill releases *all timber sales which were offered for sale beginning in fiscal year 1990 to the date of enactment* which are located in any unit of the National Forest System or District of the Bureau of Land Management *within the geographic area encompassed by Section 318* of the Fiscal Year 1990 Interior and Related Agencies Appropriations Act.

Conf. Rep. at 137 (emphasis added).

The Conference Report provides an unequivocal statement of the temporal scope of Section 2001(k)(1): The statute expressly authorizes timber sales during the period from 1990 to the enactment of the 1995 Rescissions Act.

■ Although we are convinced that the language of Section 2001(k)(1), standing alone, establishes this same broad temporal scope, we note that this explicit discussion in the Conference Report bolsters our conclusion. Ironically, the Secretaries urge us *not* to rely on the Conference Report, arguing that it uses the phrase "encompassed by Section 318" rather than "subject to section 318" that appears in the statute. However, a congressional conference report is recognized as the most reliable evidence of congressional intent because it "represents the final statement of the terms agreed to by both houses." *Dept. of Health and Welfare v. Block*, 784 F.2d 895, 901 (9th Cir.1986) (citation omitted).

### 4. The Post–Enactment Letter from Six Lawmakers

The final piece of legislative history relevant to Section 2001(k)(1) is a letter from Committee on Energy and Natural Resources Chairman Frank Murkowski and other Senators to Secretary of Agriculture Glickman and Secretary of Interior Babbitt, dated July 27, 1995, the enactment date of the 1995 Rescissions Act. It reads in part:

We want to make it clear that subsection (k) of the [timber sales] legislation applies within the geographic area of National Forest units and [Bureau of Land Management] districts that were subject to Section 318 ... and within that geographic area requires the release of all previously offered or awarded timber sales, *including Section 318 sales as well as all sales offered or awarded in other years (such as Fiscal Years 1991–1995) that are not subject to Section 318.* The reference to Section 318 in subsection (k)(1) defines the

geographic area that is subject to subsection (k).

■ We accord little weight to these statements, consistent with the principle that post-enactment legislative history merits less weight than contemporaneous legislative history. *Cose v. Getty Oil Co.,* 4 F.3d 700, 708 (9th Cir.1993). *See also Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 118, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980). We simply note that these statements are not inconsistent with our conclusion based on the language of the statute.

### 5. Conclusion

The legislative history surrounding Section 2001(k)(1), far from refuting our interpretation of the statutory language, serves to confirm it. The Conference Report, in particular, suggests Section 2001(k)(1) authorizes timber sales between the expiration of Section 318 and the enactment of the 1995 Rescissions Act. Moreover, it suggests the term "subject to section 318" defines solely the geographic scope of Section 2001(k)(1). Although the Secretaries point to scattered legislative statements characterizing the timber sales variously as "already sold" or "previously sold," such characterizations do not exclude post–1990 sales from the scope of Section 2001(k)(1). Moreover, these statements do not refute the Conference Report's clear description of the chronological scope of Section 2001(k)(1). The legislative history of the 1995 Rescissions Act, particularly the Conference Report, offers strong evidence that the phrase "subject to section 318" defines only the geographic scope of Section 2001(k)(1).

### II. Whether the District Court Erred in Denying ONRC's Motion to Intervene in NFRC's Declaratory Action

■ Intervention is governed by Fed. R.Civ.P. 24, which permits two types of intervention: intervention as of right and permissive intervention. ONRC pursued and was denied both forms below. We review de novo the district court's decision regarding intervention as a matter of right under Fed. R.Civ.P. 24(a)(2), *Idaho Farm Bureau Fed'n v. Babbitt,* 58 F.3d 1392, 1397 (9th Cir.1995), although we review for abuse of discretion its decision as to the timeliness of the intervention motion. *Id.* at 1397 (citations omitted). We review for abuse of discretion the district court's decision concerning permissive intervention pursuant to Fed.R.Civ.P. 24(b)(2). *Beckman Industries, Inc. v. Int'l Ins. Co.,* 966 F.2d 470, 472 (9th Cir.), *cert. denied,* 506 U.S. 868, 113 S.Ct. 197, 121 L.Ed.2d 140 (1992).

### A. Intervention as of Right

Regarding intervention of right, Fed. R.Civ.P. 24(a)(2) provides:

> Upon timely application anyone shall be permitted to intervene in an action ... when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

We have outlined four requirements for intervention of right under Fed.R.Civ.P. 24(a)(2): (1) the application for intervention must be timely; (2) the applicant must have a "significantly protectable" interest relating to the property or transaction that is the subject of the transaction; (3) the applicant must be so situated that disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the existing parties in the lawsuit. *Forest Conservation Council v. United States Forest Service,* 66 F.3d 1489, 1493 (9th Cir.1995) (citation omitted).

### 1. Whether ONRC's Motion to Intervene Was Timely

■ We consider three criteria in determining whether a motion to intervene is timely: (1) the stage of the proceedings; (2) whether the parties would be prejudiced; and (3) the reason for any delay in moving to intervene. *United States v. Oregon,* 913

F.2d 576, 588 (9th Cir.1990), *cert. denied,* 501 U.S. 1250, 111 S.Ct. 2889, 115 L.Ed.2d 1054 (1991).

ONRC's motion to intervene was timely. ONRC moved to intervene less than one week after NFRC filed its Section 2001(k)(1) claim, before the Secretaries had filed an answer, and before any proceedings had taken place. Moreover, ONRC's motion to intervene does not appear to have prejudiced either party in the lawsuit, since the motion was filed before the district court had made any substantive rulings.

## 2. Whether ONRC has a Significantly Protectable Interest in NFRC's Declaratory Action

Whether an applicant for intervention as of right demonstrates sufficient interest in an action is a "practical, threshold inquiry," and "[n]o specific legal or equitable interest need be established." *Greene v. United States,* 996 F.2d 973, 976 (9th Cir. 1993), *aff'd,* 64 F.3d 1266 (9th Cir.1995). The movant must, however, demonstrate a "significantly protectable interest" in the lawsuit to merit intervention. *Forest Conservation Council,* 66 F.3d at 1493 (internal quotation marks omitted). To demonstrate this interest, a prospective intervenor must establish that (1) "the interest [asserted] is protectable under some law," and (2) there is a "relationship between the legally protected interest and the claims at issue." *Id.* (*citing Sierra Club v. EPA,* 995 F.2d 1478, 1484 (9th Cir. 1993)).

ONRC asserts several interests in NFRC's declaratory action, and insists these support its intervention of right. First, it asserts that ONRC and other prospective intervenors "are non-profit environmental organizations dedicated to the prudent stewardship of national forestlands and public lands in Oregon and Washington," and have a "longstanding interest in the proper management and environmental protection of the public forestlands at issue in this case." Second, it notes that this Circuit "has repeatedly recognized the standing of many of these [organizations seeking to intervene]." Third, ONRC urges that "the proposed intervenors have long advocated for strong environmental protections

in logging on public lands in Washington and Oregon," and that they have been "catalysts for the environmental protections that are now in place in both eastern and western Washington and Oregon[,]" protections ONRC insists would be violated by the timber sales NFRC seeks in this case. It reasons that because Section 2001(k)(1) orders the release of timber sales "[n]otwithstanding any other provisions of law," ONRC has a right to intervene to prevent "defiance of our environmental laws."

But Section 2001(k)(1) does not defy or violate existing environmental laws; rather, it explicitly preempts them with its phrase "[n]otwithstanding any other provision of law." § 2001(k)(1). While it is true that a prospective intervenor's interest need only be protected under *some* law, *see Sierra Club,* 995 F.2d at 1484, the interest must relate to the litigation in which it seeks to intervene. In this case, the statute under which the declaratory action arises explicitly preempts other laws. The environmental laws that ONRC and others claim they have supported therefore cannot protect ONRC's various interests with respect to NFRC's claims under Section 2001(k)(1).

Moreover, the cases in which we have allowed public interest groups to intervene generally share a common thread: Unlike ONRC, these groups were directly involved in the enactment of the law or in the administrative proceedings out of which the litigation arose. *See, for example, Idaho Farm Bureau Fed'n,* 58 F.3d at 1397 (conservation groups have interest in litigation challenging the listing of a snail under the Endangered Species Act, where they were active in getting the snail listed); *Yniguez v. Arizona,* 939 F.2d 727 (9th Cir.1991), *aff'd in part, rev'd in part by Yniguez v. Arizonans for Official English,* 42 F.3d 1217 (9th Cir.1995), *on reh'g en banc,* 69 F.3d 920 (9th Cir.1995), *cert. granted,* — U.S. ——, 116 S.Ct. 1316, 134 L.Ed.2d 469 (1996) (sponsors of ballot initiative had sufficient interest to intervene as of right in case challenging the constitutionality of prospective intervenors' initiative); *Sagebrush Rebellion, Inc. v. Watt,* 713 F.2d 525 (9th Cir.1983), *aff'd,* 790 F.2d 760 (9th Cir.1986) (Audubon Society's interest in

the protection of birds and other animals and its active participation in the proceedings to establish a wildlife sanctuary entitled it to intervene as of right in a case challenging the validity of that sanctuary); *Washington State Bldg. Construction Trades v. Spellman*, 684 F.2d 627 (9th Cir.1982), *cert. denied by Don't Waste Washington Legal Defense Found. v. Washington*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); (allowing intervention of public interest group in lawsuit challenging measure group has supported); *Idaho v. Freeman*, 625 F.2d 886 (9th Cir.1980) (National Organization for Women permitted to intervene in suit challenging validity of ratification procedures surrounding the Equal Rights Amendment, where the organization had actively supported the amendment).

 Although we do not here rule out the possibility that a public interest organization might adduce sufficient interest to intervene even where it had not participated in or supported the legislation, we conclude that ONRC has not shown a sufficient interest to warrant intervention in this action.

### 3. Whether ONRC's Interests Would Be Impaired or Impeded by the Disposition of the Case

The third factor presupposes that the prospective intervenor has a protectable interest. Because ONRC lacks such an interest in NFRC's declaratory action, we need not elaborate on this factor. Although the disposition of the case may infringe on ONRC's generalized environmental interests, those interests do not rise to the level of "significantly protectable interests."

### 4. Whether the Secretaries' Representation is Inadequate to Protect ONRC's Putative Interests

 In determining whether an applicant's interest is adequately represented by the parties, we consider (1) whether the interest of a present party is such that it will undoubtedly make all the intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether the would-be intervenor would offer any necessary elements to the proceedings that other parties would neglect.

*California v. Tahoe Regional Planning Agency*, 792 F.2d 775, 778 (9th Cir.1986). The prospective intervenor bears the burden of demonstrating that existing parties do not adequately represent its interests. *Sagebrush*, 713 F.2d at 528. However, we follow *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 636 n. 10, 30 L.Ed.2d 686 (1972), in holding that the requirement of inadequate representation is satisfied if the applicant shows that representation "may be" inadequate. *Sagebrush*, 713 F.2d at 528.

ONRC argues that the federal defendants in the case, the Secretaries of Agriculture and Interior, do not adequately represent ONRC's interests.

ONRC insists, first, that the Secretaries cannot adequately represent its interests because it took a "differen[t] ... position[ ]" than the Secretaries did with respect to the district court's decision to enter a permanent injunction. Whereas the Secretaries favored such an order because it would be appealable, ONRC disagreed. This disagreement is minor, however, and it is not central to NFRC's declaratory action. Moreover, it reflects only a difference in strategy.

 ONRC's next argument is that the Secretaries cannot represent it adequately because ONRC and other would-be intervenors have sued the government numerous times to compel compliance with various environmental statutes. In this case, however, the Secretaries and ONRC are seeking the same limited interpretation of Section 2001(k)(1). Where an applicant for intervention and an existing party "have the same ultimate objective, a presumption of adequacy of representation arises." *Oregon Envtl. Council v. Oregon Dept. of Envtl. Quality*, 775 F.Supp. 353, 359 (D.Ore.1991) (*citing American Nat'l Bank and Trust Co. of Chicago v. City of Chicago*, 865 F.2d 144, 148 n. 3 (7th Cir.1989)).

 Because ONRC alleges only minor differences in opinion with the Secretaries, it fails to demonstrate inadequacy of representation in this case.

## B. Permissive Intervention

Regarding permissive intervention, Fed. R.Civ.P. 24(b)(2) provides:

Upon timely application anyone shall be permitted to intervene in an action ... when an applicant's claim or defense and the main action have a question or law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

We have held that a court may grant permissive intervention where the applicant for intervention shows (1) independent grounds for jurisdiction; (2) the motion is timely; and (3) the applicant's claim or defense, and the main action, have a question of law or a question of fact in common. *Greene*, 996 F.2d at 978.

In this case, ONRC fails to satisfy the first prong of the permissive intervention standard, since it asserts no independent basis for jurisdiction. Because Section 2001(k)(1) contains a mandate to the Secretaries to release certain timber sales, and admits of no limitations posed by other laws, it appears that ONRC cannot allege grounds for jurisdiction in this case.

## CONCLUSION

We AFFIRM the district court's summary judgment order of September 13, 1995, and we AFFIRM its October 17, 1995 permanent injunction.

We AFFIRM the district court's decision to deny Oregon Natural Resource Council's motion to intervene in Northwest Forest Resources Council's declaratory action.

## ORDER

May 30, 1996

The Opinion filed April 24, 1996, slip op. 4941–4971, is amended as follows:

Having amended the Opinion, the panel votes to DENY the Petition for Rehearing filed by Oregon Natural Resources Council, to DENY defendants-appellants' Petition for Rehearing or, in the Alternative, Motion for Clarification and Stay, and to GRANT Northwest Forest Resource Council's Motion to Transfer Consideration of Attorney Fees to District Court.